**FILED**

DEC 30 2013

DEC 30 2013
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Violation: Title 7, United States |
| | ) Code, Section 13(a)(4) |
| v. | ) |
| | ) |
| UMAR ALI | ) **13 CR 974** |

**JUDGE DARRAH**

**MAGISTRATE JUDGE VALDEZ**

The UNITED STATES ATTORNEY charges:

1. At times material to this information:

   a. Futures contracts were traded on contract markets, commonly known as exchanges and boards of trade, which were designated pursuant to the Commodity Exchange Act by the Commodity Futures Trading Commission, the federal agency established by statute to regulate transactions involving the purchase and sale of futures contracts. The Chicago Mercantile Exchange was one of these designated contract markets.

   b. Futures contracts were standardized, legally binding agreements to buy or sell a specific product in the future. The buyer and seller of a futures contract agreed on a price for a product or financial instrument to be delivered or settled in cash on a future date. Because the contract was to buy or sell at a future date, the seller did not need to have the specific product at the time the seller entered into the agreement.

1

c. Lean hogs futures contracts were contracts to purchase or sell lean hogs in the future. Each contract allowed an individual to buy or sell one lot of lean hogs at a specified future date, and each lot represented 40,000 pounds of hogs.

d. Traders at the Chicago Mercantile Exchange were required to trade through a clearing firm that financially assured the performance of each of the trades. The contracts in this matter were traded on the Chicago Mercantile Exchange's electronic trading platform, called Globex. Each trader had an account number registered with the Chicago Mercantile Exchange, that allowed the trader to place trades through Globex. Chicago Mercantile Exchange rules required traders to record electronically the price and quantity of the trade and to designate the account for which the trade was being placed. The electronic system automatically recorded the time of the trade. This information was then relied on and used in the clearing process, in which transactions were matched with one another by confirming that both the buyer's and the seller's trade information were in agreement.

e. It occasionally happened that a trader would make a mistake in electronically entering a trade. Such mistakes included entering the wrong quantity or type of trade, or entering the wrong account number. Traders typically reviewed their trades at the end of the trading day and notified the clearing firm of any mistakes. The clearing firms could change the records to correct such mistakes.

2

f. Chicago Mercantile Exchange rules prohibited creating or reporting a false or fictitious trade. Chicago Mercantile Exchange rules also prohibited any conduct that was inconsistent with just and equitable principles of trade.

g. Trader A was a member of the Chicago Mercantile Exchange and was authorized to buy and sell lean hogs futures contracts.

h. Between approximately 2004 and early 2009, defendant UMAR ALI was employed as a trading clerk for Trader A. In this capacity, defendant ALI had access to Trader A's Chicago Mercantile Exchange account number and was authorized to enter trades on Globex as directed by Trader A. Beginning in approximately September 2009, defendant ALI was no longer employed as Trader A's trading clerk but rather leased a membership on the Chicago Mercantile Exchange and was authorized to trade lean hogs futures contracts for his own account. From time to time, Trader A continued to direct defendant ALI to place trades on Trader A's account.

i. Clearing Firms B and C were registered with the Chicago Mercantile Exchange. Between September 2009 and September 2010, defendant ALI and Trader A cleared their trades through Clearing Firm B. Between September 2010 and October 2010, defendant ALI and Trader A cleared their trades through Clearing Firm C.

2. Beginning in or about September 2009 and continuing until in or about October 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

UMAR ALI,

defendant herein, willfully falsified, concealed, and covered up by scheme a material fact, made false, fictitious, and fraudulent material statements and representations, and made and used a false writing and document knowing the same to contain a false, fictitious, and fraudulent material statement and entry to a registered entity, namely Clearing Firm B and Clearing Firm C, and to a board of trade, namely the Chicago Mercantile Exchange, designated and registered under the Commodity Exchange Act and acting in furtherance of its official duties under the Commodity Exchange Act, which conduct is further described below.

3. It was part of the scheme that defendant ALI fraudulently allocated to Trader A trades that defendant ALI had purchased or sold for his own account without Trader A's knowledge or authorization, in part by providing false information about the trades to defendant ALI's clearing firms and ultimately to the Chicago Mercantile Exchange. In this manner, defendant ALI fraudulently avoided losses on certain trades and fraudulently increased his profits on others, all to the detriment of Trader A. In total, between approximately September 2009 and October 2010, based on these fraudulently allocated and unauthorized trades, defendant ALI caused a loss to Trader A of approximately $250,000 and increased gains to himself of approximately $240,000.

**Fraudulent Allocation At Clearing Firm B:**

4. It was further part of the scheme that between September 2009 and September 2010, while defendant ALI and Trader A cleared their trades through Clearing Firm B, defendant ALI routinely placed trades in his own account and then later fraudulently caused Clearing Firm B to change the account designation so that these trades were attributed to Trader A. Defendant ALI falsely caused these trades to be attributed to Trader A, without Trader A's knowledge or authorization.

5. It was further part of the scheme that defendant ALI knew that, because of the high volume of trades that Trader A placed on a daily basis, Trader A was unlikely to notice the particulars of specific trades that defendant ALI falsely attributed to Trader A. Defendant ALI knew that Trader A regularly reviewed his trades at the end of the day to check his position, meaning to see how many outstanding buy or sell contracts he had. In order to hide the trades that defendant ALI falsely attributed to Trader A, defendant ALI made sure to attribute to Trader A an equal numbers of buys and sells, so that these falsely attributed trades would not affect Trader A's position.

6. It was further part of the scheme that at the end of the trading day, defendant ALI called Clearing Firm B, which cleared the trades for himself and Trader A, and falsely informed Clearing Firm B that defendant ALI had mistakenly attributed certain trades to his own account, when they should have been attributed to Trader A. Defendant ALI instructed Clearing Firm B to change its records to reflect that these

trades were on Trader A's account, knowing that this was false. Clearing Firm B was misled by defendant ALI and attributed the trades to Trader A. Clearing Firm B then reported these falsely attributed trades to the Chicago Mercantile Exchange, as part of its normal clearing process.

7. It was further part of the scheme that defendant ALI falsely attributed trades to Trader A on approximately 100 days between September 2009 and September 2010. During this time period defendant ALI caused losses to Trader A of approximately $220,000 and fraudulent gains to himself of over $240,000.

**Fraudulent Allocation At Clearing Firm C:**

8. It was further part of the scheme that between September and October 2010, while defendant ALI and Trader A cleared their trades at Clearing Firm C, defendant ALI falsely attributed over 100 unprofitable trades to Trader A. During this time period, defendant ALI caused an additional loss to Trader A of over $30,000.

9. It was further part of the scheme that, on certain occasions, after defendant ALI determined whether the trades he had placed were profitable or not, defendant ALI caused certain of the unprofitable trades to be attributed to Trader A, by falsely informing Clearing Firm C that defendant ALI had mistakenly attributed these unprofitable trades to himself, when they should have been attributed to Trader A. Defendant ALI instructed Clearing Firm C to change its records to reflect that the unprofitable trades were on Trader A's account, knowing that this was false. Clearing Firm C was misled by

defendant ALI and attributed these unprofitable trades to Trader A. Clearing Firm C then reported these falsely attributed trades to the Chicago Mercantile Exchange, as part of the normal clearing process.

10. It was further part of the scheme that defendant ALI concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

11. On or about October 25, 2010, at Chicago, in the Northern District of Illinois, Eastern Division,

UMAR ALI,

defendant herein, willfully falsified by scheme a material fact, that is, defendant ALI instructed Clearing Firm C to change its records to reflect that an unprofitable 10 lot lean hog futures trade was in Trader A's account instead of defendant ALI's account, as recorded on trade number VV00YZCW, which defendant ALI knew was false, and which trade Clearing Firm C then reported to the Chicago Mercantile Exchange as part of the normal clearing process;

All in violation of Title 7, United States Code, Section 13(a)(4).

_____
UNITED STATES ATTORNEY